**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| NICOLE FOSTER, ) | |
| ) | CASE NO. 1:14CV1940 |
| Plaintiff, ) | |
| ) | |
| v. ) | MAGISTRATE JUDGE GREG WHITE |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social ) | |
| Security ) | **MEMORANDUM OPINION & ORDER** |
| ) | |
| Defendant. ) | |

Plaintiff Nicole Foster ("Foster") challenges the final decision of the Acting Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying her claim for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq*.  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is VACATED and the case is REMANDED for further proceedings.

**I.  Procedural History**

In June 2011, Foster filed applications for POD, DIB, and SSI alleging a disability onset date of March 1, 2011 and claiming she was disabled due to depression.  (Tr. 170-185, 193-194.)  Her application was denied both initially and upon reconsideration.  (Tr. 110- 16, 122-135.)  Foster timely requested an administrative hearing.  (Tr. 136-138.)

On August 6, 2012, an Administrative Law Judge ("ALJ") held a hearing during which Foster, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 30-57.) On August 22, 2012, the ALJ found Foster was able to perform a significant number of jobs in the national economy and, therefore, was not disabled. (Tr. 14-25.) The ALJ's decision became final when the Appeals Council denied further review. (Tr. 1-3.)

## II. Evidence

### *Personal and Vocational Evidence*

Age forty-one (41) at the time of her administrative hearing, Foster is a "younger" person under social security regulations. *See* 20 C.F.R. § 404.1563(c) & 416.963(c). (Tr. 38.) Foster has a 10th grade education and past relevant work as a hair stylist and home health attendant. (Tr. 23, 52-53.)

### *Relevant Medical Evidence*

On March 22, 2010, Foster presented to Jolee Gregory, M.D., for treatment of her mental health issues. (Tr. 296-297.) Foster reported she was depressed due to the death of her grandmother and her son's legal problems. (Tr. 296.) She also stated she "sometimes hears voices in her head" and "sometimes things are moved that [she] does not remember moving." *Id.* Dr. Gregory assessed reactive depression (situational) and acute stress disorder. (Tr. 297.) She prescribed Trazodone and referred Foster for a psychiatric evaluation. *Id.*

Foster returned to Dr. Gregory several days later, on March 25, 2010, for a follow-up appointment. (Tr. 294-295.) Although she reported speaking with the mobile crisis unit on two occasions, Foster stated she felt "a little better" since beginning Trazodone. (Tr. 294.) She also indicated she was "not excessively sleepy with med." *Id*. Dr. Gregory assessed reactive depression (situational) and insomnia. (Tr. 295.) She increased Foster's Trazodone dosage and "congratulated [her] on stopping drinking again and attending AA meetings." *Id*.

On June 8, 2010, Foster presented to William Zrenner, R.N., for a "Community Mental Health Diagnostic Assessment." (Tr. 290-293.) At that time, Foster reported she had been

unable to sleep for the past three months and was hearing whispering voices in the house. (Tr. 290.) She complained of depression and difficulty focusing and finishing tasks. *Id.* Foster also reported "frequent counting and re-counting of items 'to make sure it's the right number,' which she has done for many years." *Id.* Foster stated Trazodone had not helped alleviate her symptoms. *Id.* On examination, Nurse Zrenner found Foster's mood was depressed, sad, apathetic, and anxious. (Tr. 292.) He diagnosed depression and mood disorder; assessed a Global Assessment of Functioning ("GAF") score of 50;[1] and recommended Foster begin Zoloft for depression and Saphris for psychomotor agitation and mood instability. (Tr. 292-293.)

Foster returned to Nurse Zrenner on October 27, 2010. (Tr. 286-288.) She reported feeling "not too good" because her 14 year-old son had run away several months earlier and not returned; she had begun drinking again; and, she received a DUI while driving around trying to find her son. (Tr. 286.) She rated her depression a 7 on a scale of 10, but denied any suicidal ideation. *Id.* She stated Saphris had helped decrease her anger, and indicated she had "been sober since resuming meds in September." *Id.* Foster described her sleep as "good (w/ psych meds)." *Id.* With regard to side effects, Nurse Zrenner noted "no adverse effects evident," including "no excess sedation" and "no confusion." (Tr. 287.) Nurse Zrenner diagnosed depression and mood disorder and advised Foster to "continue recently resumed meds," i.e., Zoloft and Saphris. (Tr. 287-288.)

---

[1] The GAF scale reports a clinician's assessment of an individual's overall level of functioning. *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric Association, 4th ed. revised, 2000) ("DSM-IV"). An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments. A GAF score between 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. DSM-IV at 34. A GAF score between 51-60 denotes "moderate symptoms (*e.g.* flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g.* few friends, conflicts with peers or co-workers)." DSM-IV at 34. It bears noting that a recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Association, 5th ed., 2013).

On May 10, 2011, Foster presented to Smitha Battula, M.D., with complaints of depression and insomnia.  (Tr. 281-283.)  She reported a depressed and irritable mood because her mother, grandmother, and son's father had all recently passed away.  (Tr. 281.)  Foster also stated that "her sleep is poor, [she] has trouble in maintaining sleep, wakes up 4-5 times, feels tired when awake."  *Id*.  Additionally, Foster indicated "she counts tiles on the roof and also has obsessive thoughts about counting steps of the stairs and counts them more than 50 times and that is bothering her."  *Id.*  She also continued to report hearing "the whispers," and stated Saphris helped but made her feel restless.  *Id.*  Dr. Battula assessed major depressive disorder with psychotic features and obsessive compulsive disorder.  (Tr. 282.)  She prescribed Pristiq, Abilify, and Trazodone.  *Id*.

Jeff Rindsberg, Psy.D., conducted a consultative examination on September 16, 2011.  (Tr. 314- 318.)  Foster reported her depression had begun two years ago.  (Tr. 315.)  She stated she has "'whispering' experiences 'all the time,'" and the medication for this issue did not work.  (Tr. 317.)  Foster also reported counting stairs and tiles "because it makes her at ease."  (Tr. 315.)  She claimed the counting did not cause any major problems, and "she does it to deal with anxiety."  *Id*.  Foster stated she was unable to work now because "I can't function, the whispering, the medicines, can't take care of nobody."  (Tr. 316.)  She also reported "[s]he had stopped working because she was on her medications and slept a lot and forgot to go into work at times."  *Id*.

On examination, Dr. Rindsberg found Foster appeared disheveled, noting a "low degree of concern about her appearance" and poor grooming.  *Id*.  He remarked Foster "was cooperative, but looked in acute depression stress."  *Id*.  Dr. Rindsberg described Foster's mood as depressed and sad, and stated she had a "sullen demeanor."  *Id.*  He again noted that "[h]er medications make her sleep a lot," but later stated "[s]he takes her medication as prescribed without side-effects."  (Tr. 317.)  Dr. Rindsberg diagnosed major depressive disorder, single, severe with psychotic features; and, alcohol dependence, full sustained remission.  (Tr. 318.)  He

4

assessed a GAF of 40, explaining as follows:

> Ms. Foster is depressed. She is having difficulty with reality testing. This is serious in severity and equivalent to a [GAF] score of 40. She recognizes this. The impairment from her depression is serious as she hardly leaves her home. She takes care of herself at times. The impairment is serious and equivalent to a [GAF] score of 45. The lower score is adopted above.

(Tr. 318.)

With regard to Foster's functional abilities, Dr. Rindsberg concluded the following:

> In describing Ms. Foster's abilities and limitations in understanding, remembering, and carrying out instructions, Ms. Foster can understand and remember and carry out basic instructions, despite her depression and difficulty with reality testing.
>
> In describing Ms. Foster's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks, and to perform multi-step tasks, maintaining attention and concentration are not major problems. She can perform simple tasks and even multi-step. She has the voices but they do not affect her on a day-to-day basis, even though they are present.
>
> In describing Ms. Foster's abilities and limitations in responding appropriately to supervision and to co-workers in a work setting, dealing with people would be mildly affected by her depression, particularly if she does not dress appropriately and has such a low degree of concern about her appearance. She does not wish to socialize lately. She may not have the energy to have adequate inner personal relationships.
>
> In describing Ms. Foster's abilities and limitations in responding appropriately to work pressures in a work setting, handling pressure at work would be a problem. Ms. Foster cannot deal with frustration and has low tolerance for that. That was evident in this evaluation.

(Tr. 318.)

On October 24, 2011, state agency psychologist Caroline Lewin, Ph.D., reviewed Foster's medical records and completed a Mental RFC Assessment. (Tr. 67-69.) She concluded Foster was not significantly limited in her abilities to remember locations and work-like procedures or understand and remember very short and simple instructions, but was moderately limited in her ability to understand and remember detailed instructions. (Tr. 67.) With regard to Foster's sustained concentration and persistence limitations, Dr. Lewin found Foster was not significantly limited in her abilities to (1) carry out very short and simple instructions; (2)

5

perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; (3) sustain an ordinary routine without special supervision; or, (4) work in coordination with or in proximity to others without being distracted by them. (Tr. 67-68.) However, Foster was moderately limited in her abilities to (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) make simple work-related decisions; and, (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id*.

With regard to Foster's social interaction limitations, Dr. Lewin opined Foster was moderately limited in her abilities to (1) interact appropriately with the general public; (2) ask simple questions or request assistance; (3) accept instructions and respond appropriately to criticism from supervisors; (4) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and, (5) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. 68-69.)

Finally, with regard to Foster's adaptation limitations, Dr. Lewin found Foster was not significantly limited in her abilities to be aware of normal hazards and take appropriate precautions, or travel in unfamiliar places or use public transportation. (Tr. 69.) However, Foster was moderately limited in her abilities to respond appropriately to changes in the work setting, and to set realistic goals or make plans independently of others. *Id.*

Dr. Lewin further explained that Foster "still retains the capacity for work that is simple and routine in nature with tasks that remain reasonably static," but that "changes need to be both explained and demonstrated." (Tr. 68.) She further stated Foster "can relate to others in a superficial manner on a limited basis and does not require more than routine supervision;" however, "criticism should not be given in a public venue and would be better received if constructive and alternatives suggested and explained." (Tr. 69.) Lastly, Dr. Lewin remarked that "Claimant is able to at the least understand, remember, and complete [simple, routine tasks]

in environments without time or production pressure where the social interaction is limited or superficial."[2] *Id*.

On November 22, 2011, Foster presented to Jylia Lobanova, M.D., for a "Community Mental Health Assessment." (Tr. 339- 345.) Foster's chief complaint at this time was insomnia. (Tr. 339.) She also reported there were "days at a time she does not want to get out of bed, to get dressed, leave the house, finds herself crying a lot, not able to sleep." *Id*. Foster complained she "stays up all night hear[ing] noises, whispering, at nights she is cleaning, also counts stairs outside at 3 a.m., counts blocks on the garages, windows, stairs, everything which is square shape." (Tr. 340.) She reported panic attacks two to three times a week, during which she cannot breathe and feels like the "room is closing." *Id*.

On examination, Dr. Lobanova found Foster exhibited a depressed mood and a constricted, tearful affect. (Tr. 342.) She concluded Foster's thought process was logical and organized, and her judgment/insight was "good." *Id*. Nevertheless, Dr. Lobanova diagnosed major depressive disorder with psychotic features; anxiety disorder; panic disorder; obsessive compulsive disorder; and, alcohol dependence in remission. (Tr. 343.) She assessed a GAF of 51-60, denoting moderate symptoms. *Id*. Dr. Lobanova discontinued Zoloft, Saphris, and Trazodone, and prescribed Pristiq, Abilify, and Lunesta. *Id.*

Foster returned to Dr. Lobanova on December 22, 2011. (Tr. 329-332.) Foster reported she had been feeling more depressed. (Tr. 329.) She stated her "sleep is bad;" she had no energy; and, the "whispering is coming back" and getting worse. *Id.* Foster also reported

---

[2] On January 31, 2012, state agency psychologist Irma Johnston, Psy.D., reviewed Foster's records and completed a Mental RFC Assessment. (Tr. 94-96.) Therein, Dr. Johnston reached the same conclusions as Dr. Lewin regarding Foster's mental limitations except Dr. Johnston found Foster was not significantly limited (as opposed to moderately limited) in her abilities to ask simple questions or request assistance; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and, set realistic goals or make plans independently of others. *Id.*

difficulty with her attention and concentration.  (Tr. 330.)  Dr. Lobanova again diagnosed major depressive disorder with psychotic features; anxiety disorder; panic disorder; obsessive compulsive disorder; and, alcohol dependence in remission.  *Id.*  She continued Foster's prescriptions for Prestiq, Abilify, and Lunesta.  *Id.*

That same day, Dr. Lobanova completed a Medical Source Statement regarding Foster's mental capacity.  (Tr. 321-322.)  Therein, she rated Foster's ability as "poor"[3] with respect to her capacity to: (1) respond appropriately to changes in routine settings; (2) deal with the public; (3) work in coordination with or proximity to others without being unduly distracted or distracting; (4) deal with work stresses; (5) complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (6) behave in an emotionally stable manner; and, (7) relate predictably in social situations.  *Id.*

In addition, Dr. Lobanova rated Foster's ability as "fair"[4] with respect to her capacity to: (1) follow work rules; (2) use judgment; (3) maintain attention and concentration for extended periods of 2 hour segments; (4) maintain regular attendance and be punctual within customary tolerance; (5) relate to co-workers; (6) interact with supervisor(s); (7) function independently without special supervision; (8) understand, remember, and carry out complex job instructions; (9) understand, remember, and carry out detailed, but not complex job instructions; (10) maintain appearance; (11) socialize; and, (12) management of funds/schedules.  *Id.*  Foster's abilities to leave home on her own and understand, remember, and carry out simple job instructions was rated as "good."  (Tr. 322.)

In support of her assessment, Dr. Lobanova wrote: "Ms. Foster has been suffering from major depression with psychotic features.  She get[s] easily fatigued, stressed out, gets suicidal

---

[3] The form defines the term "poor" as "ability to function is significantly limited."  (Tr. 321.)

[4] The term "fair" is defined as "ability to function in this area is moderately limited but not precluded.  May need special consideration and attention."  (Tr. 321.)

ideations; get[s] paranoid around people." (Tr. 322.)

Foster returned to Dr. Lobanova on January 24, 2012, again reporting depression and poor sleep. (Tr. 324-327.) Foster stated Lunesta was not helping and "has a very bad taste." (Tr. 324.) She reported feeling depressed, moody, and apathetic; and stated she "spends most of the time in bed." *Id*. Foster also continued to report hearing whispers, stating she "cannot make them out, they get worse at night, [and] keep her up at night." *Id.* Dr. Lobanova discontinued Foster's prescriptions for Lunesta and Abilify; and prescribed Prestiq and Seroquel at bedtime. (Tr. 325.)

On February 28, 2012, Foster presented to Dr. Lobanova and reported she was sleeping during the day but not at night. (Tr. 373-374.) She also reported hearing the whispering voices and feeling "paranoid that people are out to get her." (Tr. 373.) Foster reported doing well with Seroquel and stated she was going to start walking during the day so that she could sleep at night. *Id.* Dr. Lobanova continued Foster on Prestiq and increased her dosage of Seroquel. (Tr. 374.)

On June 11, 2012, Foster presented to Rebecca Snider-Fuller, P.C.N.S. (Tr. 380-381.) She stated she had been "off of Pristiq for a month" and the "whispering is worse." (Tr. 380.) Foster also reported feeling "more and more depressed," and again complained that she could not sleep. *Id*. Nurse Snider-Fuller's examination notes indicate Foster reported paranoid thoughts and obsessive counting. *Id.* Foster also stated she bathed four times a day, washes her hands "a lot," and "doesn't go to the bathroom when she needs to." *Id.* Nurse Snider-Fuller diagnosed major depressive disorder with psychotic features, panic disorder, obsessive compulsive disorder, and alcohol dependence in remission; assessed a GAF of 60; and, prescribed Abilify, Pristiq, Trazodone, and Seroquel. (Tr. 381.)

On that same date, Foster presented to social worker Kristen Liviskie, L.I.S.W. for an initial behavioral health counseling session. (Tr. 383-384.) Foster discussed her struggles with alcohol addiction and reported feeling depressed. (Tr. 383.) Ms. Liviskie described Foster's

mood as dysphoric and her affect as blunt. (Tr. 384.) She recommended biweekly treatment sessions. *Id*.

On July 25, 2012, Ms. Liviskie completed a Medical Source Statement regarding Foster's mental capacity. (Tr. 378-379.) Therein, she rated Foster's ability as "poor" with respect to her capacity to: (1) maintain attention and concentration for extended periods of 2 hour segments; (2) respond appropriately to changes in routine settings; (3) deal with the public; (4) relate to co-workers; (5) function independently without special supervision; (6) deal with work stresses; (7) complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (8) understand, remember, and carry out complex job instructions; (9) understand, remember, and carry out detailed, but not complex job instructions; (10) socialize; and, (11) relate predictably in social situations. *Id*.

In addition, Ms. Liviskie rated Foster's ability as "fair" with respect to her capacity to: (1) follow work rules; (2) use judgment; (3) maintain regular attendance and be punctual within customary tolerance; (4) interact with supervisors; (5) work in coordination with or proximity to others without being unduly distracted or distracting; (6) understand, remember, and carry out simple job instructions; (7) behave in an emotionally stable manner; and, (8) manage funds/schedules. *Id*. Foster's abilities to maintain appearance and leave home on her own were rated as "good." (Tr. 379.)

In support of her assessment, Ms. Liviskie wrote: "Pt is still trying to get stabilized on proper medications. Reports meds cause significant amount of grogginess which impairs ability to work. Auditory hallucinations also impair ability to be around others." (Tr. 379.) Psychiatrist Jyoti Aneja, M.D., co-signed Ms. Liviskie's opinion.[5] *Id*.

***Hearing Testimony***

---

[5] The parties do not direct this Court's attention to anything in the record indicating Dr. Aneja ever examined or treated Foster.

During the August 6, 2012 hearing, Foster testified to the following:

- She left school in the 10th grade and has not obtained a GED. (Tr. 53.) She lost her drivers license in 2009 after a DUI. (Tr. 49.)

- She has a cosmetology license. She worked for approximately ten years as a hair stylist. She worked out of her basement, where she washed, permed, cut, curled and sometimes dyed hair. She eventually stopped working in this position because of pain in her knees, arms, and hands. She obtained a home health attendant license, and worked in that position until March 2010. She quit that job because she would "lose focus." (Tr. 39-42.)

- She hears voices. The voices whisper to her, particularly at night. She cannot make out what they are saying. She also has a compulsive need to count things. She feels the need to count "all the time" because it helps to "ease the talk– the conversation that's going on in her head." She cannot sleep at night because she is constantly checking the windows and the locks on the door. (Tr. 46-47.)

- She cannot work because of her focus issues. She is "on all these medications, and it keeps me kind of down all day." (Tr. 42.) She sleeps nine hours "off and on" during the day, and then has difficulty sleeping at night. (Tr. 44-45.) She tries not to sleep during the day but Seroquel makes her feel "down" and "groggy." *Id.*

- She also cannot work because her knees "hurt really bad." (Tr. 45.) She had x-rays which showed osteoarthritis. Her knees have been a problem for her for the past two years. (Tr. 46.)

- She has not consumed alcohol for approximately two and a half years. When she was drinking, it was to "try to get rid of the whispering." (Tr. 49.)

- She lives in a single family home with her sister; her sister's three children; and, two of her own children, ages 16 and 2. She is able to help with chores such as cleaning, vacuuming, dusting, and dishes. Her sister helps take of the children. She (Foster) spends most of the day sleeping and watching television (Tr. 42-44.)

The VE testified Foster had past relevant work as a hair stylist (light, skilled) and home health attendant (medium performed as heavy, semi-skilled). (Tr. 52-53.) The ALJ then posed the following hypothetical:

> [W]e have a 40-year-old with limited education, past relevant work experience in the two occupations you've identified who is able to perform work that is limited to simple, routine, repetitive tasks in an environment with no more than occasional changes in the tasks to be performed. The work should involve no more than occasional and superficial interaction with the public or with coworkers. The work should involve no fast pace, and, as I said, no more than occasional changes in the tasks. Okay. Would the person be able to perform any of Ms. Foster's past work?

11

(Tr. 53-54.) The VE testified such an individual could not perform Foster's past relevant work, but could perform the jobs of hand packager (medium, unskilled); small products assembler (light, unskilled); and, housekeeper (light, unskilled). (Tr. 54.)

Foster's attorney then asked the VE the following questions:

Q: Mr. Anderson, if an individual is going to need extra rest periods throughout the day due to psychological symptoms, maybe two extra 15-minute breaks in addition to any breaks they are already given, how do you think that would affect their ability to remain employed?

A: Well, it depends on are the 15 minutes broken up. If they had to be 15 consecutive minutes, then that's going to be an issue. They are not going to be able to meet production for that particular hour. So for two hours out of the eight, they are not going to be able to meet production. If it would be broken up in shorter periods, then the jobs I talked about would still be available.

Q: So it hinges essentially how—

A: How long– if she needs a whole 15 minutes at a time, then that's going to be an issue. If it can be broken up into shorter rest periods, then it would fit into generally what would be allowed by the production standards.

Q: And if an individual were to miss two or more days per month due to psychological symptoms, how would that affect their ability to remain employed?

A: Well, it depends on how many or more– there was a general article that just came out about that, and generally after probation, which is 30 days in most cases, the employer will tolerate two absences, tardy, or leaving early. When it goes to three, it becomes an issue. If someone consistently missed three or more days in a month, generally, they are not considered to be employable at a competitive standard.

(Tr. 55-56.)

### III. Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[6]

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and, (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Foster was insured on her alleged disability onset date, March 1, 2011, and remained insured through the date of the ALJ's decision, August 22, 2012. (Tr. 14.) Therefore, in order to be entitled to POD and DIB, Foster must establish a continuous twelve month period of disability commencing between those dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

### IV. Summary of Commissioner's Decision

The ALJ found Foster established medically determinable, severe impairments, due to major depressive disorder with psychotic features, anxiety disorder, panic disorder, and obsessive-compulsive disorder; however, her impairments, either singularly or in combination,

---

[6] The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 17-19.) Foster was found incapable of performing her past work activities, but was determined to have a Residual Functional Capacity ("RFC") for the full range of work at all exertional level but with certain non-exertional limitations. (Tr. 19-24.) The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Foster was not disabled. (Tr. 24-25.)

## V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing*

*Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. Analysis

### *Dr. Lobanova*

In her first assignment of error, Foster argues the ALJ erred in evaluating Dr. Lobanova's December 22, 2011 opinion. She maintains that, although the decision stated it was giving that opinion "controlling weight," the RFC in fact fails to address several of the limitations offered by Dr. Lobanova. Specifically, Foster argues "the ALJ's statement that Ms. Foster could handle routine tasks was contrary to the fact that [the ALJ] recognized that there was a poor ability to respond appropriately to changes in routine settings." (Doc. No. 14 at 9.) Further, Foster asserts

"the ALJ accepted a poor ability to relate to co-workers and the public, but limited interactions to occasional and superficial." *Id*. Moreover, Foster claims the ALJ failed to address Dr. Lobanova's opinion that Foster had a poor ability to complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. *Id*. at 11. Because the ALJ failed to acknowledge this particular opinion or explain why it was implicitly rejected, Foster argues the ALJ failed to follow the treating physician rule and remand is necessary.

The Commissioner argues the ALJ reasonably evaluated the medical opinions of record. (Doc. No. 15 at 8.) She notes the ALJ also assigned "considerable weight" to the opinions of Dr. Rindsberg, Dr. Lewin, and Dr. Johnston, and "recognized that all sources found that Ms. Foster would have some difficulties with complex tasks, fast-paced work, changes in work routine, and interactions with others." *Id*. at 9. However, the ALJ also recognized that these sources agreed Foster could still handle simple, routine tasks with occasional interaction with the public or co-workers. Because the RFC is consistent with the opinion evidence as a whole, the Commissioner asserts it is supported by substantial evidence.

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the

16

factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[7]

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers*, 486 F.3d at 242 (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5). The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id*. (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting

---

[7] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

Here, the ALJ recognized Foster suffered from the severe impairments of major depressive disorder with psychotic features; anxiety disorder; panic disorder; and obsessive-compulsive disorder. (Tr. 17.) The decision recounted Foster's self-reported limitations, and thoroughly discussed the medical evidence of record. (Tr. 19-21.) The ALJ concluded Foster's medically determinable impairments could reasonably be expected to cause her alleged symptoms; however, her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible. (Tr. 19.) In making this finding, the ALJ noted that, although Foster stated she had "always" had difficulty focusing and finishing tasks, her past relevant work included semi-skilled and skilled work. (Tr. 22.) The ALJ further explained that mental health professionals had "regularly noted" Foster's attention span/concentration was "sustained" or "sustained, not distracted." *Id*. Finally, the ALJ remarked that Foster had acknowledged "on a number of occasions" that her medications are helpful, and her appearance had been routinely described by treating sources as neat and "well groomed." *Id*.

The ALJ then evaluated the opinion evidence. With regard to consultative examiner Dr. Rindsberg, the ALJ gave "considerable weight to this opinion because it is generally consistent with the evidence as a whole, but I find it more reasonable to preclude Ms. Foster from multi-

step tasks." (Tr. 21.) As for state agency physicians Dr. Lewin and Dr. Johnston, the ALJ gave "both opinions considerable weight because they are consistent with the evidence as a whole." (Tr. 21-22.) The ALJ weighed Dr. Lobanova's opinion as follows:

> On December 22, 2011, Dr. Lobanova completed a "Medical Source Statement" form in which she reported Ms. Foster to have poor ability to handle changes in routine, deal with the public or coworkers, or stress but she is able to handle simple routine tasks. Dr. Lobanova also provided the diagnosis of major depression with psychotic features. (exh. 5F). I accept this opinion and give it controlling weight in forming the residual functional capacity.

(Tr. 22.) Finally, the ALJ weighed the opinion of Ms. Liviskie/Dr. Aneja as follows: "I accept this opinion, giving it great weight, as it indicates that Ms. Foster's condition continues to be severe. I accept it to the extent that it is similar to the limitations outlined in the statement at Exhibit 5F since Dr. Lobanova treated Ms. Foster for longer than Ms. Liviskie/Dr. Anega [sic]." *Id.*

The Court finds the ALJ failed to properly address Dr. Lobanova's opinion. While the decision purports to ascribe "controlling weight" to this opinion,[8] it neither acknowledges or addresses Dr. Lobanova's specific conclusion that Foster had a "poor" (i.e., "significantly limited") ability to "complete a normal workday or work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 322.) This is significant because the VE testified that, if Foster needed additional breaks of 15 consecutive minutes in duration, she would not be able to perform the jobs identified in response to the ALJ's hypothetical. (Tr. 55-56.) Here, Dr. Lobanova expressly opined that Foster had a poor ability to complete a workday or workweek

---

[8] The ALJ does not explicitly describe Dr. Lobanova as Foster's "treating physician." However, the Court finds the ALJ's statement that Dr. Lobanova's opinion was being accorded "controlling weight" indicates the ALJ viewed Dr. Lobanova as a treating source. The Court notes that, at the time Dr. Lobanova completed her December 22, 2011 opinion, she had only seen Foster on two occasions. While the Court thus has some doubt whether Dr. Lobanova constituted a "treating physician" at the time she rendered her opinion, the Commissioner does not challenge Foster's argument that Dr. Lobanova constituted a treating source and the ALJ was therefore required to provide "good reasons" for rejecting her opinions.

"without an unreasonable number *and length* of rest periods." (Tr. 322) (emphasis added). Thus, this opinion is arguably inconsistent with Foster's ability to work according to the VE's testimony.

Based on the above, the Court finds the ALJ failed to provide "good reasons" for implicitly rejecting Dr. Lobanova's opinion regarding Foster's ability to complete a normal workday and perform at a consistent pace without an unreasonable number and length of rest periods. Although there may be good reasons to reject Dr. Lobanova's opinion on this issue, the ALJ is required to articulate those reasons in order to allow for meaningful appellate review. Because the ALJ failed to do so here, the Court is constrained to remand for further consideration of Dr. Lobanova's opinion.[9]

### VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner not supported by substantial evidence. Accordingly, the decision is VACATED and the case is REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this opinion.

IT IS SO ORDERED.

/s/ Greg White
U.S. Magistrate Judge

Date: August 4, 2015

---

[9] In the interest of judicial economy, the Court will not address Foster's arguments that the ALJ failed to properly evaluate the July 25, 2012 opinion of Ms. Liviskie/Dr. Aneja and failed to consider the side effects of Foster's medications.